**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Scott Plourde

      v.                              Civil No. 18-cv-342-PB
                                         Opinion No. 2019 DNH 152

Andrew Saul,[1] Commissioner,
Social Security Administration

## O R D E R

Scott Plourde moves to reverse the decision of the Commissioner of the Social Security Administration ("SSA") to deny his applications for supplemental security income, or SSI, under Title XVI of the Social Security Act, 42 U.S.C. § 1382. The Commissioner, in turn, moves for an order affirming his decision. For the reasons that follow, I deny Plourde's motion and affirm the decision of the Commissioner.

### I. Scope of Review

The scope of judicial review of the Commissioner's decision is as follows:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive
> . . . .

---

[1] On June 17, 2019, Andrew Saul was sworn in as Commissioner of Social Security. He replaced the nominal defendant, Nancy A. Berryhill, who had been Acting Commissioner of Social Security.

42 U.S.C. § 405(g) (setting out standard of review for decisions on claims for DIB); see also 42 U.S.C. § 1383(c)(3) (applying § 405(g) to SSI decisions). However, the court "must uphold a denial of social security disability benefits unless 'the [Commissioner] has committed a legal or factual error in evaluating a particular claim.'" Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the standard of review that applies when an applicant claims that an SSA adjudicator made a factual error,

> [s]ubstantial-evidence review is more deferential than it might sound to the lay ear: though certainly "more than a scintilla" of evidence is required to meet the benchmark, a preponderance of evidence is not. Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted). Rather, "[a court] must uphold the [Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (per curiam).

Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).

In addition, "'the drawing of permissible inference from evidentiary facts [is] the prime responsibility of the [Commissioner],' and 'the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [him], not for the doctors or for the courts.'" Id. (quoting Rodriguez, 647 F.2d at 222). Thus, the

court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).

## II. Background

### A.  Biography

Plourde was born in 1975.  He has not had a full-time job since 2010, but before that he worked as a motorcycle assembler, automobile sales person, solar-energy installer helper, asphalt distributor, and denture model maker.  In 1996, Plourde had a motorcycle accident in which he fractured his C-6 vertebra.  He fractured his cervical spine in 2009.  And in 2012, he was hit in the head with a baseball bat during a mugging.

### B.  Medical History

In this section I eschew a full history of Plourde's medical treatment but, rather, I focus on the treatment records that are relevant to the issues in this case.

#### 1.  Neck Injury

In January of 2015, Plourde saw Dr. Timothy Sievers of the Elliot Hospital Interventional Spine Center.  Dr. Sievers reported: (1) "a history of traumatic injury to the cervical spine," Administrative Transcript (hereinafter "Tr.") 1683; (2) a chief complaint of "mechanical neck pain," id.; and (3) and an

impression of cervical spondylosis,[2] see id. Dr. Sievers treated

Plourde with "cervical medial branch blocks at C4 through C7."

Id. In March, Dr. Sievers reported that the January treatment

"did help [Plourde] diagnostically and therapeutically and [that

he] had moderate improvement noted on a reevaluation," Tr. 1664,

but he also reported that Plourde was "having a lot of posterior

headaches," id. Dr. Sievers also administered a second set of

cervical medial branch blocks. In addition, after examining

Plourde, Dr. Sievers noted that his exam was "consistent with

occipital neuralgia with tenderness [around the] occipital nerve

outlet and pain radiating up and over [Plourde's] head."[3] Id.

About a month after Plourde's second set of cervical medial

branch blocks, Dr. Sievers reported:

> He is seen for followup to evaluate the efficacy of
> his second set of injections, which was notably
> helpful . . . . He has much less neck pain at this
> point and is approximately 80% or greater improved
> regarding neck pain.
>
> He is still having considerable occipital headaches.
> At the time of his last visit, he was found to have
> tender occipital nerve outlets provocative for

---

[2] Spondylosis is "[a]nkylosis of the vertebra; often applied
nonspecifically to any lesion of the spine of a degenerative
nature." Stedman's Medical Dictionary 1813 (28th ed. 2006).
Ankylosis is "[s]tiffening or fixation of a joint as a result of
a disease process, with fibrous or bony union across the joint;
fusion." Id. at 95.

[3] Occipital means "referring to the [occipital] bone or to
the back of the head." Stedman's, supra note 2, at 1354.
Neuralgia is "pain extending along the course of one or more
nerves." Id. at 1281.

occipital head pain.  He is scheduled today for
occipital nerve blocks, bilaterally.

Tr. 1650.

Dr. Sievers saw Plourde again in June of 2015, and he

diagnosed Plourde with cervicogenic headaches and neck pain.  He

also wrote:

The patient would be an excellent candidate for
radiofrequency lesioning as he had 2 sets of medial
branch blocks with consistent and reproducible results
with greater than 80% regarding reduction in neck pain
for several weeks to months' duration each time.

Tr. 1642.  In August, Plourde underwent radiofrequency

lesioning.  At a followup visit in September, Dr. Sievers

reported:

Scott has posttraumatic neck and head pain.  He has
recently under[gone] radiofrequency lesioning of the
medial branch nerves to multiple cervical facet levels
bilaterally.  He is seen for followup with very good
relief of his symptoms.  The patient has stopped
having cervicogenic headaches and has very minimal
neck ache.  He has some residual muscular symptoms
from deconditioning but otherwise doing very well,
taking a very infrequent tramadol, and thinking about
getting back to work.

IMPRESSION: Cervicogenic neck and head pain with
excellent results after radiofrequency lesioning.

FOLLOWUP: I expect this to be a long-term result, and
I am pleased to report that Scott is doing so well.
We will simply leave the door open for him for further
treatment if needed.

Tr. 1617.  At followup appointments in December of 2015 and

January of 2016, Plourde reported a gradual return of his neck

pain.  In February, Dr. Sievers gave Plourde a diagnosis of

"[c]ervical spondylosis and facet arthropathy with chronic cervicalgia,"[4] Tr. 1586, and performed a second radiofrequency lesioning procedure.

Between April and December of 2016, Plourde saw Dr. Sievers eight more times. In April, Dr. Sievers wrote: "The patient is doing quite well regarding neck pain, but has been having a lot of occipital headaches." Tr. 1796. Dr. Sievers continued to report good results from the radiofrequency lesioning with respect to Plourde's neck pain, but he also diagnosed Plourde with "subacute cervical radiculitis,"[5] Tr. 1803. In June and August, Dr. Sievers gave Plourde cervical epidural steroid injections for his radiculitis, and those treatments were generally effective. See Tr. 2054, 2065.

### 2. Headaches

In July of 2015, Plourde was referred to a neurologist, Dr. Jorge Almodovar Suarez, for treatment of chronic headaches. Dr. Almodovar Suarez diagnosed Plourde with "chronic migraines without aura, with a post-traumatic component," Tr. 1548, and he

---

[4] Arthropathy is "[a]ny disease affecting a joint." Stedman's, supra note 2, at 161. "Cervicalgia is neck pain." Bubar v. Astrue, No. 11-cv-107-JL, 2011 WL 6937507, at *2 n.1 (D.N.H. Dec. 5, 2011) (citing Stedman's, supra note 2, at 48, 351), R. & R. approved by 2011 WL 6937476 (Dec. 30, 2011).

[5] Radiculitis is a synonym for radiculopathy, which is a "[d]isorder of the spinal nerve roots." Stedman's, supra note 2, at 1622.

prescribed gabapentin.[6]  After a followup visit in October, Dr.

Almodovar Suarez reported:

> Since the last visit we started gabapentin 600 mg qhs
> which he thinks has decreased the frequency and
> intensity of the pain.  No[w] he has suffered just a
> few headaches since the last visit.  He has started
> working part time at this time, and he has been
> suffering headaches halfway through the day.  After
> work it is quite dramatic.

Tr. 1829.  Dr. Almodovar Suarez had this to say after an office

visit in April of 2016:

> We had attained initial control with gabapentin 300-
> 600.  However, after undergoing a cervical spine
> interventional procedure the headaches worsened.  He
> is scheduled to have occipital nerve blocks soon.  He
> is suffering headaches at least twice a week, and they
> last days at a time.  A prednisone taper did not help
> with one of those headaches.  No nausea or vomiting
> with the headaches, but they are quite debilitating.

Tr. 1831.[7]

Finally, in July of 2016, Plourde received a Depacon

infusion for a migraine headache.  <u>See</u> Tr. 1918.

### 3.  Mental Health

Plourde has been diagnosed with attention deficit

hyperactivity disorder ("ADHD"), depression, a learning

---

[6] Gabapentin is "an anticonvulsant . . . used as adjunctive
therapy in the treatment of partial seizures."  <u>Dorland's
Illustrated Medical Dictionary</u> 753 (32nd ed. 2012).

[7] Prednisone is used "as an antiinflammatory and immune-
suppressant in a wide variety of disorders."  <u>Dorland's</u>, <u>supra</u>
note 6, at 1531.

disorder, opioid dependence, and alcohol dependence. For those conditions, he has treated with several practitioners, including two psychiatrists, Dr. Ekaterina Hurst and Dr. Quentin Turnbull, and a nurse practitioner, Leslie Clukay. From those providers, he has received individual therapy and prescriptions for various medications.

### C. Applications for Benefits

Plourde first applied for SSI in January of 2012, claiming that he had been disabled since April of 2009 as a result of two neck fractures, a knee injury, headaches, ADHD, asthma, and high blood pressure. He filed a second application for SSI in April of 2015, claiming that he had been disabled since January of 2014 as a result of a broken neck; blood clots in his right lung, right arm, and chest; spondylolisthesis;[8] seven broken vertebrae; numbness in his hands; constant pain in his shoulders, neck, chest, and arms; vertigo; severe migraines; ringing in his ears; ADHD; anxiety; depression; and high blood pressure.

The SSA denied Plourde's first application, and after a hearing, an administrative law judge ("ALJ") issued a decision that was unfavorable to Plourde. He appealed, and the SSA

---

[8] Spondylolisthesis is "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or on the sacrum." Stedman's, supra note 2, at 1813.

Appeals Council ("AC") remanded his case.  After a second

hearing: the same ALJ denied benefits again; the AC affirmed the

ALJ; Plourde appealed to this court; the Commissioner

voluntarily remanded the matter; and the AC vacated the ALJ's

second decision on Plourde's first application and consolidated

both applications into a single claim.

In July of 2016, a second ALJ held a third hearing in this

matter.  That ALJ's determination that Plourde was not disabled

is the subject of this appeal.

### D.  Opinions on Plourde's Physical Condition

The Disability Determination Explanation ("DDE") form that

resulted from Plourde's first application includes an assessment

of his physical residual functional capacity ("RFC"),[9] made in

February of 2012, by Dr. Jonathan Jaffe, a state-agency medical

consultant who reviewed Plourde's medical records but did not

examine him.  According to Dr. Jaffe, Plourde could: (1) lift

and/or carry 20 pounds occasionally; (2) lift and/or carry 10

pounds frequently; and (3) push and/or pull the same amount of

weight he could lift and/or carry.  Dr. Jaffe also opined that

Plourde could sit (with normal breaks), and could stand and/or

walk (with normal breaks) for about six hours in an eight-hour

---

[9] "[R]esidual functional capacity 'is the most [a claimant]
can still do despite [his or her] limitations.'"  Purdy, 887
F.3d at 10 n.2 (quoting 20 C.F.R. § 416.945(a)(1)) (brackets in
the original).

work day. With respect to postural activities, Dr. Jaffe opined that Plourde could frequently balance, but could only occasionally climb ramp/stairs, climb ladders/ropes/scaffolds, stoop, kneel, or crawl. In his decision, the ALJ gave great weight to Dr. Jaffee's opinions.

The DDE form that resulted from Plourde's second application also includes an assessment of his physical RFC by a non-examining state-agency physician, and the ALJ gave that RFC assessment little weight. But because the ALJ's evaluation of the physical RFC assessment in the second DDE form is not at issue, there is no need to describe that assessment in any detail.

In August of 2015, on the same day he performed Plourde's first radiofrequency lesioning, Dr. Sievers completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on Plourde. In the realm of exertional limitations, Dr. Sievers opined that: (1) Plourde could frequently lift less than ten pounds; (2) his capacities for standing and walking were not affected by his physical impairments; (3) he needed to alternate periodically between sitting and standing to relieve pain; and (4) his capacities for pushing and pulling were limited by his neck pain. When asked to indicate the medical/clinical findings that supported the exertional limitations he posited, Dr. Sievers wrote: "chronic neck pain →

worsened by prolonged positioning." Tr. 1725. In the realm of

postural limitations, Dr. Sievers opined that Plourde could

occasionally climb ramps/stairs/ladders/ropes/scaffolds,

balance, kneel, crouch, crawl, and stoop, and he further noted

that more than occasional engagement in those activities would

increase Plourde's neck pain. In the realm of manipulative

limitations, Dr. Sievers opined that Plourde could only reach

overhead occasionally but had an unlimited capacity for

handling, fingering, and feeling. With respect to the

limitation on overhead reaching, Dr. Sievers explained that

"overhead reaching necessitates cervical extension which

exacerbates neck pain." Tr. 1726.

As for attention/concentration, the form that Dr. Sievers

completed asked:

> Is it medically reasonable to expect that this
> patient's ability to maintain attention and
> concentration on work tasks throughout an 8 hour day
> is significantly impaired [by] pain, prescribed
> medication or other factors such that the patient is
> likely to be off task even 15 to 20% of an 8 hour
> work day?

Tr. 1726. Dr. Sievers responded: "unaffected unless pain ↑'d."

Id. The final question on the form asked:

> If there is any other medical condition which in your
> opinion so significantly diminishes this patient's
> abilities that he cannot consistently perform 5
> consecutive 8 hour days of work, on an ongoing basis
> for the foreseeable future or which could reasonably
> be expected to cause your patient to lose one or more

days from work each month for medical reasons please
identify the condition and briefly explain here:

Tr. 1727.  Dr. Sievers responded: "N/A."  Id.

The ALJ gave Dr. Sievers's "opinion partial weight to the
extent that he [found] the claimant [was] not unable to work."
Tr. 923.

In May of 2016, Dr. Almodovar Suarez, the neurologist who
was treating Plourde for his headaches, referred him to Samantha
Smith, an occupational therapist, for a functional capacity
evaluation ("FCE").  Ms. Smith put Plourde through a battery of
tests and documented the results in an FCE report.  She
summarized her findings: "He demonstrates abilities within the
sedentary to light [range of] physical demands with lifting
tasks and [the] light to medium [range of] demands with pushing
and pulling tasks."  Tr. 1846.  More specifically, Ms. Smith
reported that Plourde had the capacity for: (1) occasional (up
to 1/3 of the day) static standing; (2) occasional dynamic
standing; (3) occasional walking; and (4) occasional sitting.
With respect to lifting, pushing, and pulling, she reported:

> Occasional/Sedentary (10 pounds up to 1/3 of the work
> day) with some Light capabilities with a demonstrated
> ability to lift 17 lbs from floor to knuckle . . .

> Occasional/Sedentary (10 pounds up to 1/3 of the work
> day) with some Light capabilities with a demonstrated
> ability to lift 12 lbs safely from knuckle to shoulder
> . . .

Occasional/Sedentary (10 pounds up to 1/3 of the work day) with some Light capabilities with a demonstrated ability to <u>lift</u> 17 lbs safely <u>from to 12 inches to knuckle</u> . . .

[<u>Pushing</u>:] Occasional/Medium (20 to 50 pounds up to 1/3 of the work day) with an initial force of 50 lbsf and a sustained force of 45 lbsf over a distance of 25 feet. . . .

[<u>Pulling</u>:] Occasional/Light (20 pounds up to 1/3 of the work day) with some Medium capabilities with an initial force of 40 lbsf and a sustained force of 35 lbsf over a distance of 25 feet.

Tr. 1844-45 (emphasis added). Ms. Smith further stated that Plourde was capable of occasional climbing, balancing, crouching, prolonged neck positioning, reaching forward, handling, and pinching. Finally, Ms. Smith reported that: (1) Plourde gave "near full levels of physical effort" during testing, Tr. 1843; (2) he might, at times, be able to do more than he demonstrated during testing; and (3) he reported a headache half way through testing and "[t]esting was terminated due to [his] increasing worry about his migraine and his long drive home, in regards to his ability to drive safely," Tr. 1846.

Shortly after Ms. Smith produced her FCE report, Dr. Almodovar Suarez wrote a letter to Plourde in which he said:

I have reviewed the functional capacity report performed [by Ms. Smith] at Elliot Rehabilitation Services on 5/25/2016. Based on your visits with me, your history and evaluation, and response to treatment, I agree with the conclusions of the evaluation report.

13

1771.  However, Dr. Almodovar Suarez did not identify any
specific evidence from his treatment notes that supported Ms.
Smith's conclusions nor did he even state the conclusions with
which he agreed.

In his decision, the ALJ described Ms. Smith's FEC report
as documenting that "the claimant demonstrated sedentary to
light duty abilities for lifting tasks and light to medium
physical levels for pushing and pulling tasks, despite his self-
reporting of limitations to less than sedentary levels," Tr.
923, and he gave those findings "partial weight to the extent
that [Ms. Smith's FCE report] reflect[ed] [that] the claimant
[had] the ability to work at a range of light exertional work."
Tr. 923.

E.  Opinions on Plourde's Mental Condition

In February of 2012, in connection with an application for
Aid to the Permanently and Totally Disabled ("APTD") from the
State of New Hampshire, Dr. Hurst, who had treated Plourde,
completed a Psychiatric Evaluation on him.  She gave diagnoses
of ADHD and depression.  In addition, she offered opinions on
Plourde's deficits in four areas of functioning.  She opined
that he had a marked degree of functional loss in the area of

daily activities,[10] a marked degree of functional loss in the
area of social interactions,[11] a constant degree of functional
loss in the area of work-related task performance,[12] and a
continual degree of functional loss in the area of work-related
stress reaction.[13]  The ALJ gave little weight to Dr. Hurst's
opinions.

The DDE form that resulted from Plourde's first application
includes a psychiatric review technique ("PRT") assessment
performed in March of 2012 by Dr. Michael Schneider, a state-
agency psychological consultant who reviewed Plourde's medical
records but did not examine him.[14]  Dr. Schneider considered two

---

[10] She explained: "Reports his disability mainly related to
neck pain.  Cannot lift weights; cannot play musical
instruments.  This affects his mood, making depression and
anxiety worse."  Tr. 487.

[11] She explained: "Reports his disability significantly
limits his social interactions – he cannot dance and cannot
participate in his usual sports due to pain."  Tr. 487.

[12] She explained: "Reports not being able to do his work –
he worked on motorcycles – as related to physical pain.  This,
in turn, contributes to his depression + anxiety."  Tr. 487.

[13] She explained: "Reports continuous deterioration since
his neck trauma, due to pain + physical limitations.  He refuses
to take opioid meds as they worsen his addiction but cannot
function with current level of pain.  Overall [he] feels[s]
dissatisfied with life due to not being able to work and carry
on with his usual social activities."  Tr. 487.

[14] The SSA employs the PRT to evaluate the severity of
mental impairments at two points in the five-step sequential
evaluation process it uses to determine whether a claimant is
disabled.  See 20 C.F.R. § 416.920a.  However, the PRT only

mental impairments, organic mental disorders and affective disorders, but determined that while Plourde had been diagnosed with those impairments, neither of them was sufficiently severe to satisfy the criteria that define an impairment that is per se disabling under the SSA's regulations.  With respect to the so-called paragraph B criteria, Dr. Schneider determined that Plourde had: mild restrictions of his activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration.  The DDE form does not include an assessment of Plourde's mental RFC.

The ALJ gave little weight to Dr. Schneider's opinions because, in his view, "the evidence reflect[ed] greater limitations in [Plourde's] ability to maintain focus and concentration" than Dr. Schneider expressed in his opinion, Tr. 926.

In May of 2013, Dr. Turnbull completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on Plourde.  On that two-page check-box form, Dr. Turnbull

_____

"serves as a backdrop for the more detailed mental RFC assessment."  Downs v. Colvin, No. 14-cv-319-LM, 2015 WL 3549322, at *3 (D.N.H. June 8, 2015) (quoting Littlefield v. Colvin, No. 14-cv-53-LM, 2015 WL 667641, at *3 n.5 (D.N.H. Feb. 17, 2015)).

indicated diagnoses of depressive disorder, ADHD, opioid dependence, and alcohol dependence. Under the heading "Understanding and Memory," Dr. Turnbull opined that Plourde's ability to understand and remember detailed instructions was markedly limited or precluded. Under the heading "Sustained Concentration and Persistence," he gave the same rating, i.e., markedly limited or precluded, to Plourde's abilities to: (1) carry out detailed instructions; (2) maintain attention and concentration sufficient to perform work tasks throughout an eight-hour work day; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) work in coordination with or proximity to others without being distracted by them; and (5) complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Under the heading "Social Interaction," Dr. Turnbull rated Plourde's ability to respond appropriately to criticisms from supervisors as markedly limited or precluded, and under the heading "Adaptation," he gave the same rating to Plourde's ability to set realistic goals or make plans independently of others. The ALJ gave little weight to Dr. Turnbull's opinions.

In September of 2013, also in connection with an application for APTD, Dr. Almos Nagy examined Plourde and

completed a Mental Health Evaluation Report on him.  Dr. Nagy

gave diagnoses of depressive disorder, ADHD, and a learning

disorder.  With respect to Plourde's then-current level of

functioning, Dr. Nagy had this to say:

a.  **Activities of Daily Living**: . . . [Reports
    generally being able to do basic and instrumental
    ADL's even though he has some difficulty with
    basic task completion that involves obsessiviy,
    compulsivity, difficulty sustaining attention,
    and sustaining goal directedness].

b.  **Social Functioning**: . . . [S]ome irritability,
    impulsivity affecting interpersonal relationships
    but overall getting along well with peers.  [H]e
    is also described to have difficulty with social
    skills and judgment and has longstanding
    difficulty getting along with his father (the
    nature of which is unclear).

c.  **Concentration, persistence or pace**: . . . [T]ask
    competition issues reportedly caused problems at
    work, which includes his lack of sustained
    attention, decreased goal directedness, and
    increased compulsiveness (preoccupation with
    cleanliness, orderliness).

d.  **Episodes of decompensation**: . . . [P]atient had
    no psychiatric admissions, but reports having had
    five "nervous brake downs" (details are unclear).

e.  **Reaction to Stress, Adaptation to Work or Work-
    like Situations**: . . . [T]he details are unknown
    how he lost his own bike shop and how his other
    employments ended.  It appears that the above
    described executive and attention issues were the
    barriers for continued work.

Tr. 373, 374-75.

The ALJ gave "Dr. Nagy's opinion partial weight to the

extent that he [found] the claimant with moderate limitations in

maintaining concentration, persistence and pace," Tr. 926, and

he further noted that Dr. Nagy's opinion was incorporated into

his assessment of Plourde's mental RFC, see id.

The DDE form that resulted from Plourde's second

application includes a PRT assessment performed in July of 2015

by Dr. Jan Jacobson, a state-agency psychological consultant who

reviewed Plourde's medical records but did not examine him.  Dr.

Jacobson considered four mental impairments, organic mental

disorders, affective disorders, anxiety-related disorders, and

substance-addiction disorders, but determined that while Plourde

had been diagnosed with those disorders, none of them was

sufficiently severe to satisfy the criteria that define an

impairment that is per se disabling under the SSA's regulations.

With respect to the so-called paragraph B criteria, Dr. Jacobson

determined that Plourde had: mild restrictions of his activities

of daily living; mild difficulties in maintaining social

functioning; mild difficulties in maintaining concentration,

persistence, or pace; and no repeated episodes of

decompensation, each of extended duration.  The DDE form does

not include an assessment of Plourde's mental RFC.

The ALJ gave little weight to Dr. Jacobson's opinions

because, in his view, "the evidence reflect[ed] greater

limitations in [Plourde's] ability to maintain focus and

concentration" than Dr. Jacobson expressed in the opinion, Tr. 926.

In August of 2015, Plourde saw Leslie Clukay at the mental Health Center of Greater Manchester.  In her Progress Note, under the heading "History," she wrote:

> He was self employed for many years.  He was a welder fabricator.  He is seeking SS because of the physical difficulties he has.  We discussed that his psychiatric disabilities would likely not preclude him from working again, however he feels the physical concerns he has exacerbate the depression and anxiety.

Tr. 1712.

The ALJ gave Ms. Clukay's "opinion . . . partial weight to the extent that it reflect[ed] [that] the claimant's psychological impairments [were] not disabling [and did not] result in marked functional limitations."  Tr. 924.

F.   The 2016 Hearing

In July of 2016, Plourde received a third hearing on his claim for SSI.

In an opening statement, Plourde's counsel focused on headaches as the impairment that most affected Plourde's ability to work:

> As you know the problem that they just don't seem to be able to get a handle on is these migraine headaches.  . . . [W]hen he gets the injections he gets some relief from the neck pain.  He's had radio frequency ablation which helps with the pain, but they just don't seem to be able to do anything with the headaches, and that's really the currently most incapacitating [symptom].

Tr. 1026.  Thereafter, Plourde offered the following testimony about his headaches:

> I pretty much have a migraine sometimes that lasts me a week at a time and I just can't even get out of bed.
>
> . . . .
>
> [O]ver the years . . . the migraines [have] gotten so bad to the point where weeks – it used to be like three days in a row I would have migraines until the doctor would, you know, give me something to break it. Now it's weeks at a time and I have to go in and sit in a chair for . . . three hours to get an infusion to break the migraine.

Tr. 1047, 1049-50.  He also testified that he gets a migraine about once a week that lasts for three days.  <u>See</u> Tr. 1054.

As for his mental impairments, Plourde testified that: (1) he was taking Adderall for his ADHD and was also taking medication for anxiety and depression, <u>see</u> Tr. 1056;[15] (2) his anxiety and depression started when he broke his neck; (3) his intensive therapy for those conditions had ended two years previously; and (4) those conditions had improved to the point where he was seeing a counselor for them once every two months.  <u>See</u> Tr. 1056-58.

---

[15] Adderall is a "trademark for a combination preparation of amphetamine and dextroamphetamine, used in the treatment of attention-deficit/hyperactivity disorder and narcolepsy."  <u>Dorland's</u>, <u>supra</u> note 6, at 26.

Later on in the hearing, the ALJ took testimony from a
vocational expert ("VE").  The ALJ began by asking the VE to

> assume a hypothetical individual of the Claimant's
> same age and education and with [the] past jobs [the
> VE had] just described [who] would be limited to . . .
> a light RFC with the following postural limitations.
> Occasional ramps and stairs, occasional ladders and
> scaffolds, frequent balance, then occasional stoop,
> occasional kneel, occasional crouch, occasional crawl.
> Finally this individual will have the following
> environmental limitations.  Should have no more than
> frequent exposure to dust, odors, fumes, and
> irritants.

Tr. 1076-77.  The VE testified that the hypothetical individual

the ALJ described could perform only two of Plourde's past jobs:

automobile sales person and denture model maker.  Then the ALJ

further limited his hypothetical individual to performing only

simple, routine tasks.  According to the VE, that additional

limitation would rule out the automobile sales person and

denture model maker jobs, but would still permit the performance

of three light-duty jobs: ticket seller, marker, and hand

packager.

The ALJ continued by giving the VE a new hypothetical

individual to consider:

> This will be based on a sedentary RFC.  You'll have a
> sit/stand option defined as alternate to standing for
> five minutes after every hour of sitting.  Us[e] of
> hand controls with both the right and left hand[s] on
> occasional basis.  Will have the following
> manipulative limitations.  When it comes to reaching
> overhead in . . . all planes occasional with both the
> left and right hand, so reaching overhead in all
> planes occasional left and right.  And finally,

> occasional on all postural limitations. And those are
> occasional ramps, stairs, ladders, scaffolds, and
> balance, stoop, kneel, crouch, and crawl. I know this
> would exclude all past work because there was none in
> the sedentary basis, but would there be any work for
> such an individual in the national or regional
> economy?

Tr. 1078-79. The VE testified that the ALJ's second
hypothetical individual could perform the job of surveillance-
systems monitor. In response to another question from the ALJ,
the VE testified that all work would be precluded if the
hypothetical "individual would be off task up to 15% of the day
due to combined effects of pain, fatigue, and the health
symptoms," Tr. 1079.

Finally, in response to a question from Plourde's counsel,
the VE testified that a person would not be able to work as a
ticket seller, marker, hand packager, or surveillance-systems
monitor if he "was going to miss consistently more than one day
[of work] a month." Tr. 1084.

G. The ALJ's 2017 Decision

After Plourde's 2016 hearing, the ALJ issued a decision in
which he determined that Plourde had six severe impairments:
degenerative disc disease (cervical spine), status post spinal
cord injury, headaches, anxiety, depressive disorder, and ADHD.
But he went on to determine that none of those impairments,
either alone or in combination, was severe enough to meet or
equal the severity of any of the physical or mental impairments

that the SSA deems to be per se disabling.  In making that
determination, the ALJ found that Plourde had mild restrictions
on his activities of daily living and no episodes of
decompensation.  He also made these findings:

> In social functioning, the claimant has moderate
> difficulties.  He reports that he regularly spends
> time with others at church and on-line on the
> computer.  He reports that he goes to church about 4
> hours per week, and uses the computer 20 minutes each
> day.  He also reports no problems getting along with
> others.
>
> With regard to concentration, persistence or pace, the
> claimant has moderate difficulties.  Although the
> claimant reports having difficulty staying focused on
> work that is not hands on due to pain.  He reports
> that he is able to follow written instructions well.
> He also reports that his is able to complete chores,
> and plays music.

Tr. 916 (citations to the record omitted).

The ALJ then made the following assessment of Plourde's
RFC:

> [T]he claimant has the residual functional capacity to
> perform light work as defined in 20 CFR 416.967(b).
> He is able to frequently balance, and occasionally
> stoop, kneel, crouch, crawl, and climb ramps, stairs,
> ladders, ropes and scaffolds.  He is limited to
> frequent exposure to dust, odors, fumes and pulmonary
> irritants.  He is able to understand, remember and
> carry out simple, routine tasks.

Tr. 916.[16]  When assessing Plourde's RFC, the ALJ gave a thorough

recitation of Plourde's testimony about his headaches and then

concluded:

> While the claimant's records do support a finding of a
> severe impairment of headaches, these have been
> considered in the claimant's residual functional
> capacity assessment.  His [medical] records do not
> support the frequency and intensity alleged by the
> claimant.

Tr. 919-20.

Based upon the RFC quoted above and the testimony of the

VE, the ALJ determined that Plourde was unable to do any of his

past relevant work but retained the RFC to perform the unskilled

light-duty jobs of ticket seller, marker, and hand packager.  On

that basis, he ruled that Plourde had not been under a

disability since January 11, 2012, the date on which he filed

his first application.

---

[16] The SSA regulations define light work in the following
way:

> Light work involves lifting no more than 20 pounds at
> a time with frequent lifting or carrying of objects
> weighing up to 10 pounds.  Even though the weight
> lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing,
> or when it involves sitting most of the time with some
> pushing and pulling of arm or leg controls.  To be
> considered capable of performing a full or wide range
> of light work, [a person] must have the ability to do
> substantially all of these activities.

20 C.F.R. § 416.967(b).

## III. Discussion

### A.  The Legal Framework

To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to income and assets.  42 U.S.C. § 1382(a).  The only question in this case is whether the ALJ correctly determined that Plourde was not under a disability from January 11, 2012, through the date of the ALJ's decision, January 22, 2017.

To decide whether a claimant is disabled for the purpose of determining eligibility for SSI, an ALJ is required to employ a five-step sequential evaluation process.  See 20 C.F.R. § 416.920.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Purdy, 887 F.3d at 10 (quoting Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001); citing 20 C.F.R. § 416.920).

At the first four steps in the sequential evaluation
process, the claimant bears both the burden of production and
the burden of proof.  See Purdy, 887 F.3d at 9 (citing Freeman
v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001)); see also Bowen
v. Yuckert, 482 U.S. 137, 146 (1987).  He must prove he is
disabled by a preponderance of the evidence.  See Mandziej v.
Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.
Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).[17]  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) [claimant]'s
> subjective claims of pain and disability as supported
> by the testimony of the [claimant] or other witness;
> and (3) the [claimant]'s educational background, age,
> and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797
F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690
F.2d 5, 6 (1st Cir. 1982)).

B.  Plourde's Claims

Plourde claims that the ALJ erred by: (1) improperly
assessing his physical RFC; (2) improperly assessing his mental
RFC; and (3) relying upon testimony the VE gave in response to a

---

[17] At step five, the burden of proof shifts to the
Commissioner, see Seavey, 276 F.3d at 5 (citing Arocho v. Sec'y
of HHS, 670 F.2d 374, 375 (1st Cir. 1982)), but in this case,
the Commissioner's step-five determination is not at issue in a
way that requires me to describe the mechanics of step five.

hypothetical question that did not accurately reflect his RFC.
I am not persuaded by any of Plourde's claims.

### 1. Physical RFC

The ALJ determined that claimant had the RFC to perform
light work, with certain postural limitations, but without any
limitation on his capacity for overhead reaching. Plourde
claims that the ALJ made three errors in assessing his physical
RFC: (1) improperly interpreting and weighing Dr. Sievers's
opinions; (2) mischaracterizing Ms. Smith's FCE report and
failing to give good reasons for discounting Dr. Suarez's
opinion; and (3) improperly assessing the functional limitations
resulting from his headaches.

### a. Dr. Sievers's Opinions

The ALJ gave partial weight to the opinions of Dr. Sievers,
the physician who performed cervical medial branch blocks and
radiofrequency lesioning on Plourde in 2015 and 2016.
Specifically, the ALJ credited Dr. Sievers's opinion that
Plourde was "not . . . unable to consistently work on a full-
time basis." Tr. 923. As reasons for crediting that part of
Dr. Sievers's opinion, the ALJ cited: (1) Dr. Sievers's
"personal knowledge of the claimant and his medical history,"
id.; (2) his finding that Dr. Sievers's opinion was "consistent
with his own treatment records, showing good results from
chronic pain management, including cervical injections and

radiofrequency lesioning," id.; and (3) Plourde's "ability to
continue to carry out an active daily routine, with part-time
work and regular social activities," id.

Plourde claims that the ALJ erred by failing to give
controlling or substantial weight to several of Dr. Sievers's
other opinions, i.e., that he could lift and/or carry only ten
pounds, which limited him to sedentary work, and that he had a
limited capacity for overhead reaching.  In claimant's view, if
the ALJ had credited those limitations, the ALJ would have been
compelled to conclude that he was disabled.  That is because the
one job the VE said Plourde could perform with the limitations
posited by Dr. Sievers, surveillance-systems monitor, is too
rare to support a finding that a person capable of performing
only that job is capable of performing jobs that exist in
significant numbers in the national economy.

The regulations governing applications such as the two in
this case, which were filed before March 27, 2017, provide that

> [i]f [the SSA] find[s] that a treating source's
> medical opinion on the issue(s) of the nature and
> severity of [a claimant's] impairment(s) is well-
> supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not
> inconsistent with the other substantial evidence in
> [the claimant's] case record, [the SSA] will give it
> controlling weight.

20 C.F.R. § 416.927(c)(2).[18]

The problem with Plourde's claim that the ALJ improperly
discounted Dr. Sievers's opinions limiting him to sedentary work
and no overhead reaching is that those opinions are not just
unsupported by the medical evidence, they are contradicted by
that evidence.  In his August 3, 2015, Medical Source Statement,
Dr. Sievers made it clear that the exertional and manipulative
limitations he identified resulted from Plourde's neck pain.
But on the same day he completed that statement, Dr. Sievers
performed the first of two radiofrequency lesioning procedures
on Plourde, procedures that Dr. Sievers's subsequent records
describe as a successful treatment for Plourde's neck pain.[19]
And for his part, the ALJ pointed out, correctly, that Dr.

---

[18] For SSI claims filed on or after March 27, 2017, the
rules for evaluating medical opinions are set out in 20 C.F.R. §
416.920c.  See 20 C.F.R. § 416.927.

[19] Those records include the following notations: (1) "seen
for followup with very good relief of his symptoms," Tr. 1617
(Sept. 16, 2015); (2) "did quite well with radiofrequency
lesioning," Tr. 1600 (Jan. 8, 2016); (3) "patient is doing quite
well regarding neck pain," Tr. 1796 (Apr. 5, 2016); (4) "has
done well with facet blocks and radiofrequency lesioning," Tr.
1803 (May 12, 2016); (5) "radiofrequency lesioning . . . has
been notably helpful for neck pain," Tr. 1811 (May 31, 2016);
(6) "has responded well to radiofrequency lesioning," Tr. 1818
(June 15, 2016); (7) "patient has also been treated for his neck
pain with radiofrequency lesioning x2, and is doing reasonably
well regarding that," Tr. 2035 (Aug. 26, 2016); and (8) "patient
has had two sessions of radiofrequency lesioning, and certainly
his neck pain is better than it was previously," Tr. 2054 (Oct.
26, 2016).

Sievers's treatment records showed "good results from chronic pain management, including cervical injections and radiofrequency lesioning." Tr. 923. Because Dr. Sievers's treatment records demonstrate successful treatment of the neck condition that resulted in the exertional and manipulative limitations he expressed in the opinions on which claimant relies, those opinions are unsupported by the medical evidence and/or inconsistent with the record as a whole. Accordingly, substantial evidence supports the ALJ's decision not to give controlling weight to Dr. Sievers's opinions on Plourde's exertional capacity and his capacity for overhead reaching.

Of course, when an ALJ does not give controlling weight to the opinion of a treating source, he must still determine the amount of weight to give it, based upon an evaluation of: (1) the "[l]ength of the treatment relationship and the frequency of examination," 20 C.F.R. § 416.927(c)(2)(i); (2) the "[n]ature and extent of the treatment relationship," § 416.927(c)(2)(ii); (3) the degree to which the source of the opinion presents medical evidence to support it, see § 416.927(c)(3); (4) the degree to which the opinion is consistent with the record as a whole, see § 416.927(c)(4); (5) whether the source of the opinion is a specialist in the area in which he or she has offered an opinion, see § 416.927(c)(5); and (6) other factors, such as the source's familiarity with the requirements of the

SSA's programs and the information in the claimant's case file,
see § 416.927(c)(6).  Moreover, an ALJ must "always give good
reasons . . . for the weight [he] give[s] [a claimant's]
treating source's medical opinion."  § 416.927(c)(2).  Good
reasons, in turn, are reasons that: (1) "offer a rationale that
could be accepted by a reasonable mind," Levesque v. U.S. Soc.
Sec. Comm'n, Acting Comm'r, No. 18-cv-420-LM, 2019 WL 2004298,
at *4 (D.N.H. May 7, 2019) (quoting Dimambro v. U.S. Soc. Sec.
Admin., Acting Comm'r, No. 16-cv-486-PB, 2018 WL 301090, at *10
(D.N.H. Jan. 5, 2018)); and (2) are "both specific . . . and
supportable," Dimambro, 2018 WL 301090, at *10 (quoting Jenness
v. Colvin, 15-cv-005-LM, 2015 WL 9688392, at *6 (D.N.H. Aug. 27,
2015)).

The medical records that provide substantial evidence for
the ALJ's decision not to give controlling weight to Dr.
Sievers's opinions on Plourde's exertional and manipulative
limitations also provide substantial evidence for the ALJ's
decision to give those opinions little weight.  After Dr.
Sievers gave his opinions, the treatment he administered
substantially ameliorated the physical condition that caused the
limitations to which he had previously opined.  Because the
opinions on which Plourde relies are neither supported by the
medical evidence nor consistent with the record as a whole,
which the ALJ duly noted, the ALJ gave good reasons for

discounting Dr. Sievers's opinions.  Thus, Plourde's argument to

the contrary provides no basis for remanding this matter.

b.  Ms. Smith's FCE Report

The ALJ gave partial weight to the findings in Ms. Smith's

FCE report.  Specifically, while noting that Ms. Smith was "not

an acceptable medical source," Tr. 923, because she is a

physical therapist, the ALJ gave "the findings of [her]

evaluation, as confirmed by Dr. Suarez, partial weight to the

extent that [the FCE report] reflect[ed] the claimant [had] the

ability to work at a range of light exertional work."  Tr. 923.

He then explained:

> Ms. Smith had the opportunity to personally observe
> the claimant perform function-by-function testing, and
> Dr. Suarez has personal knowledge of the claimant and
> his medical history.  The testing is also generally
> consistent with the claimant's medical records,
> showing chronic pain that has been controlled with
> treatment, and with his daily activities, including
> his looking for new work, mountain biking, and
> kayaking.

Id.

Plourde claims that the ALJ erred by: (1) construing Ms.

Smith's FCE report as reflecting a capacity for light work when

it only reflected a capacity for sedentary work; (2) failing to

give controlling or great weight to the Smith/Suarez opinion

that he could only do sedentary work; and (3) using Smith's FCE

report as evidence that he could perform three light-duty jobs.

According to Plourde, the ALJ should have: (1) construed the FCE

33

report as expressing an opinion that he could perform only sedentary work; (2) given that opinion "significant, if not controlling weight," Cl.'s Mot. to Reverse (doc. no. 8) 18; and (3) not found that he was capable of performing three light-duty jobs. In Plourde's view, the ALJ's errors were outcome determinative because if the ALJ had construed Ms. Smith's FCE report as reflecting a capacity for only sedentary work, and had given that opinion substantial or controlling weight, he could not have determined that Plourde was capable of performing the light-duty jobs of ticket seller, marker, and hand packer. I do not agree.

Plourde's claim rests on the premise that the ALJ misconstrued Ms. Smith's FCE report, but he did not. In her report, Ms. Smith wrote:

> He [Plourde] demonstrates abilities within the sedentary to light [range of] physical demands with lifting tasks and [the] light to medium [range of] demands with pushing and pulling tasks.

Tr. 1846. The ALJ characterized Ms. Smith's conclusions this way:

> At [Ms. Smith's] functional capacity evaluation, the claimant demonstrated sedentary to light duty abilities for lifting tasks and light to medium physical levels for pushing and pulling tasks . . .

Tr. 923.  Plainly, the ALJ accurately characterized Ms. Smith's
FCE report.[20]

I also cannot agree with Plourde's contention that "Ms.
Smith's objective test results are consistent with only
sedentary work."  Cl.'s Mem. of Law (doc. no. 8) 17.  Plourde
bases that contention on the fact that the FCE report indicates
that he never lifted any more than 17 pounds while light work
requires occasional lifting of up to 20 pounds, see 20 C.F.R. §
416.967(b).  But "[s]edentary work involves lifting no more than
10 pounds at a time," § 416.967(a), and Ms. Smith's FCE report
indicates that Plourde lifted up to 17 pounds, could push 20 to
50 pounds, and could and pull 20 pounds, which indicates a
capacity for more than sedentary work.  Because a "claimant's
inability to perform the full range of light work does not

---

[20] Plourde contends that it was "erroneous for the ALJ to
find that the evaluation 'reflects that the claimant has the
ability to work at a range of light exertional work.'"  Cl.'s
Mot. to Reverse (doc. no. 17) 17 (quoting Tr. 923).  But the ALJ
did not find that the FCE report reflected a capacity to perform
light work.  He found, accurately, that the report documented
some sedentary capacities, some light-duty capacities, and some
medium-duty capacities.  Then he gave the report "partial weight
to the extent that it reflects the claimant has the ability to
work at a range of light exertional work."  Tr. 923.  Thus,
rather than finding that the FCE report expressed an opinion
that Plourde had a light-duty RFC, the ALJ used Ms. Smith's
finding that Plourde had some light-duty capacities to support
his determination that Plourde had a capacity to perform light-
duty work.  In other words, the ALJ did not misconstrue or
misrepresent the findings in Ms. Smith's FCE report; he merely
used an accurate characterization of those findings to reach a
conclusion with which claimant does not agree.

compel the conclusion that he is only capable of less physically demanding (i.e., sedentary) work," Putnam v. Astrue, No. 10-cv-371-SM, 2011 WL 3320518, at *4 (D.N.H. Aug. 1, 2011) (citing Templeton v. Comm'r of Soc. Sec., 215 F. App'x 458, 463 (6th Cir. 2017)), I cannot agree that Ms. Smith's FCE report indicates a capacity for no more than sedentary work. That ends the matter.

### c. Limitations Resulting from Headaches

Claimant argues that because the ALJ found his headaches to be a severe impairment, because the VE testified that missing more than one day of work per month would preclude employment, and because he offered evidence about the frequency and severity of his headaches, the ALJ committed reversible error by "fail[ing] to determine the frequency with which Mr. [he] would miss work," Cl.'s Mot. to Reverse (doc. no. 8) 18. The manner in which the ALJ dealt with claimant's headaches provides no basis for a remand.

While Plourde is correct in noting that he offered testimony about the frequency and duration of his headaches, the ALJ addressed that testimony, finding it inadequately supported by the medical records, and Plourde does not challenge the ALJ's evaluation of his testimony. Moreover, even if the ALJ had found Plourde's testimony to be adequately supported, a claimant's "statements of symptoms alone are not enough to

establish the existence of a physical or mental impairment or disability." Social Security Ruling 16-3p, 2016 WL 1119029, at *2 (S.S.A. Mar. 16, 2016). And because Plourde has produced no medical opinion evidence "linking [his headaches] to any limitation in [his] ability to [maintain attendance at work]," Reynolds v. Colvin, No. 14-cv-439-LM, 2015 WL 2452718, at *6 (D.N.H. May 22, 2015),[21] and because the "ALJ, as a lay person, is not qualified to interpret raw data in a medical record," Manso-Pizarro, 76 F.3d at 17, "the ALJ did not err by formulating an RFC that did not include a . . . limitation" on Plourde's ability to maintain an acceptable rate of attendance, Reynolds, 2015 WL 2452718, at *6; cf. Montrose v. Berryhill, No. 17-cv-148-SM, 2017 WL 6767238, at *8 (D.N.H. Dec. 14, 2017) ("Because claimant bears the burden of proving that she is disabled, the lack of an opinion assessing the functional significance of her Achilles enthesopathy provides no basis for determining that the ALJ committed a reversible error in assessing her RFC, and the mere possibility that Achilles

---

[21] Moreover, when asked whether Plourde had any medical condition "which could reasonably be expected to cause [his] patient to lose one or more days from work each month for medical reasons," Tr. 1727, Dr. Sievers replied "N/A," id., which I construe as an opinion that Plourde would miss less than one day of work each month for medical reasons. And indeed, the record includes no opinion from a medical expert indicating that Plourde's physical impairments would cause him to miss more than one day of work each month.

enthesopathy could affect balance and claimant's ability to walk the two or more hours required for sedentary work does not alter that conclusion.") (citations, internal quotation marks and brackets omitted), R. & R. approved by 2018 WL 262828 (Jan. 2, 2018).

Finally, to the extent that Plourde is claiming that the ALJ was obligated to include headache-related limitations in his RFC once he determined that Plourde's headaches were a severe impairment, he is mistaken. See Lord v. Berryhill, No. 18-cv-475-LM, 2019 WL 4018308, at *11 (D.N.H. July 23, 2009) (rejecting claim that "once the ALJ found [claimant's] epicondylitis and CTS to be severe impairments, he was obligated to include limitations resulting from those impairments in her RFC") (citing Johnson v. Berryhill, No. 16-cv-375-PB, 2017 WL 4564727, at *4 (D.N.H. Oct. 12, 2017); Hines v. Astrue, No. 11-cv-262-PB, 2012 WL 2752192, at *12 (D.N.H. July 9, 2012)), R. & R. approved by 2019 WL 4015552 (Aug. 23, 2019).

In sum, the ALJ's decision not to include a headache-based limitation on Plourde's capacity to maintain adequate attendance at work provides no basis for remanding this matter; claimant has failed to produce sufficient evidence to support the inclusion of such a limitation in his RFC.

## 2. Mental RFC

The mental RFC the ALJ assigned Plourde includes a limitation to performing jobs that involve understanding, remembering, and carrying out simple routine tasks. Plourde claims that the ALJ made five errors in assessing his mental RFC: (1) failing to include any limitations resulting from his moderate difficulties in maintaining social functioning and failing to including adequate limitations resulting from his moderate difficulties in maintaining concentration, persistence, or pace; (2) improperly discounting the treating-source opinions of Drs. Hurst and Turnbull; (3) "cherry picking" evidence from the record to discount Dr. Turnbull's opinion; (4) making an assessment of his mental RFC that was not supported by a medical opinion; and (5) assessing his mental RFC by interpreting raw medical data.

### a. Inadequate Limitations

First, Plourde claims that because the ALJ determined that he had moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace, the ALJ was obligated to include limitations in his RFC above and beyond a limitation to jobs that only required him "to understand, remember and carry out simple, routine tasks," Tr. 916.

**Social functioning**.  For his claim that the ALJ was obligated to include limitations on social functioning in his RFC, Plourde relies on <u>Trebilcock v. Barnhart</u>, No. 04-18-P-S, 2004 WL 2378856 (D. Me. Oct. 25, 2004), <u>R. & R. accepted by</u> 2004 WL 2607801 (Nov. 15, 2004).  Claimant's reliance on <u>Trebilcock</u> is misplaced.

In <u>Trebilcock</u>, when making findings on the severity of the claimant's mental impairments at the PRT stage, the ALJ found that the claimant had "mild to moderate difficulty in [maintaining] social functioning," 2004 WL 2378856, at *4 n.4, but when assessing her mental RFC, the ALJ "found no restrictions on social functioning," <u>id.</u>  On review, Magistrate Judge Cohen explained that "[o]ne would expect a finding of mild to moderate difficulty in [maintaining] social functioning at the [PRT] stage to manifest itself in parallel findings at the [RFC] assessment stage," <u>id.</u>, and that such an "unexplained discrepancy [was] troubling and, in other circumstances, could alone constitute reversible error," <u>id.</u>  But in the case before him, he found the error to be harmless because there was other evidence in the record, in the form of a PRT assessment from a medical expert, supporting "the notion that the [claimant's] mental impairments had no more than a mild impact on her social functioning," <u>id.</u> (citing PRT assessment by Dr. Lewis Lester).  So too, here.

Like Dr. Lester in Trebilcock, both Dr. Schneider and Dr. Jacobson made PRT assessments in which they opined that Plourde had only mild difficulties in maintaining social functioning. See Tr. 127, 1097.[22] Thus, presuming that it was an error for the ALJ not to include any limitation on social functioning in Plourde's RFC,[23] that error was harmless, under the reasoning of Trebilcock.

**Concentration, persistence, or pace**. Plourde also claims that the ALJ erred by failing to include adequate limitations in his RFC resulting from his moderate difficulties in maintaining concentration, persistence, or pace. His argument, however, goes no further, and he identifies neither additional limitations the ALJ should have included in his RFC nor evidence in the record that would support any limitations beyond the one

---

[22] While the ALJ gave little weight to the opinions of those doctors, his concern was that they understated the limitations on Plourde's "ability to maintain focus and concentration," Tr. 926, not that they understated the limitations on his capacity for social functioning. Thus, the ALJ did not discount the opinions of Drs. Schneider and Jacobson that Plourde had only mild difficulties in maintaining social functioning.

[23] Trebilcock rests on the premise that a moderate difficulty identified at the PRT stage generally requires a limitation at the RFC stage, but "[t]he First Circuit has recognized that moderate mental limitations impose no significant restriction on the range of work a claimant can perform." Brindley v. Colvin, No. 14-cv-548-PB, 2016 WL 355477, at *4 (D.N.H. Jan. 29, 2016) (quoting Hines, 2012 WL 2752192, at *12 (citing Falcon-Cartagena v. Comm'r of Soc. Sec., 21 F. App'x 11, 14 (1st Cir. 2001)).

he did include, *i.e.*, a limitation to performing jobs that require only the ability "to understand, remember and carry out simple, routine tasks." Tr. 916. That alone is a sufficient basis for rejecting this part of Plourde's claim. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). Furthermore, in his reply brief, claimant effectively concedes that "the limitation to simple, routine tasks by the ALJ . . . sufficed to take into account [his] moderate limitation in concentration, persistence or pace." Cl.'s Reply (doc. no. 16) 4. Thus, I need say no more about this claim.

However, even if I did need to address this issue, I would not conclude that the limitation the ALJ did include is insufficient. When formulating an RFC, an ALJ is obligated to "incorporate[e] concrete restrictions that 'capture[ ] essence' of, or are consistent with, the limitations identified by experts." Dimambro, 2018 WL 301090, at *9 (quoting Carver v. Colvin, 600 F. App'x 616, 620 (10th Cir. 2015)) (other citations omitted). In Dimambro, "the ALJ's RFC finding captured the essence of Dr. Jamieson's opinion regarding Dimambro's moderate persistence limitations," and his need for "a simple job setting, with clear expectations, and reasonably supportive supervision," by "finding that Dimambro could only understand,

remember, and carry out simple one-to-three step tasks for two-
hour periods over the course of an eight-hour workday," 2018 WL
301090, at *9. And in <u>Sheehan v. Berryhill</u>, where "the ALJ
supportably found only moderate limitations [in concentration,
persistence, or pace]," No. 18-cv-586-SM, 2019 WL 2406342, at *3
(D.N.H. Mar. 27, 2019), <u>R. & R. approved by</u> 2019 WL 2406337
(Apr. 12, 2019), the ALJ captured the essence of that limitation
and supportably "accounted for [the claimant's] limited ability
to stay on task and sustain pace by restricting her to routine
work that was 'not fast-paced,'" <u>id.</u> Here, I have no trouble
concluding that the ALJ captured the essence of a moderate
limitation on concentration, persistence, or pace by limiting
Plourde to jobs that required understanding, remembering, and
carrying out simple, routine tasks. <u>See</u> <u>McLain v. Astrue</u>, No.
SACV 10-1108 JC, 2011 WL 2174895, at *6 (C.D. Cal. June 3, 2011)
("Moderate mental functional limitations – specifically
limitations in social functioning and adaptation . . . do [not]
preclude the performance of jobs that involve simple, repetitive
tasks.") (citing <u>Rogers v. Comm'r of Soc. Sec.</u>, No. 09-CV-01972-
JLT, 2011 WL 445047, at (E.D. Cal. Jan. 25, 2011); <u>Koehler v.</u>
<u>Astrue</u>, 283 F. App'x 443, 445 (9th Cir. 2008)).

<u>b. Treating Source Opinions</u>

**Dr. Hurst's opinions**. The ALJ gave little weight to Dr.
Hurst's opinions on grounds that they were "based upon the

43

claimant's own reports of activity and limitation and [were] not based upon clinical evaluations, objective testing, or observations of the claimant's activities." Tr. 926.[24] Plourde claims that the ALJ erred by incorrectly stating that Dr. Hurst's opinions were based upon his own reports and further contends that the ALJ should have given those opinions greater weight because "the records from The Mental Health Center of Greater Nashua depict a person unable to consistently perform basic work activities," Cl.'s Mot. to Reverse (doc. no. 8) 7. The ALJ did not commit a reversible error in evaluating Dr. Hurst's opinions.

The ALJ discounted Dr. Hurst's opinions in part because they were based upon Plourde's reports to Dr. Hurst rather than on any clinical evaluation by Dr. Hurst. The ALJ's

---

[24] The ALJ also said he gave Dr. Hurst's opinion "little weight [because it] was given for a separate program, and not for purposes of establishing disability under the Social Security disability program." Tr. 926. However, I note Judge Laplante's recent statement that "[i]n light of the similarities between the SSA's Psychiatric Review Technique . . . and the New Hampshire [Disability Determination Unit]'s Psychiatric Review Template . . . it would seem difficult to characterize the SSA disability program and the APTD disability program as having different criteria, or as being, as the ALJ said in his decision, 'distinct . . . separate and unrelated.'" Bodette v. Colvin, No. 15-cv-282-JL, 2016 WL 4197581, at *7 (D.N.H. Aug. 9, 2016) (quoting the record). And, for what it worth, the ALJ did give partial weight to Dr. Nagy's opinion, even though it, like Dr. Hurst's opinion, was given to establish eligibility for New Hampshire's APTD program.

characterization of Dr. Hurst's opinions is borne out by the
record; Dr. Hurst herself pointed out that each of the four
opinions she gave was based upon Plourde's reports.  See supra
notes 10-13; Tr. 487.  And indeed, "[s]tatements in a medical
record that merely repeat a claimant's subjective complaints are
not medical opinions."  Tann v. Berryhill, No. 16-cv-449-JD,
2017 WL 1326235, at *5 n.6 (D.N.H. Apr. 10, 2017).  Moreover,
while Plourde argues that the ALJ erroneously characterized Dr.
Hurst's opinions as being based upon subjective complaints, he
supports that argument largely with medical records that
document even more of his subjective complaints and reports.  In
short, the ALJ's evaluation of Dr. Hurst's opinions gives me no
cause to remand this matter.

**Dr. Turnbull's opinions**.  The ALJ gave little weight to Dr.
Turnbull's opinions.  After describing those opinions, he
explained his evaluation of them this way:

> I have given little weight to the opinion of Dr.
> Turnbull as it is not consistent with or supported by
> the evidence of record.  His treatment notes regularly
> describe the claimant as having intact mental status
> examinations and document engagement in activities
> inconsistent with the level of limitation he checked
> off.  Even considering the additional medical evidence
> of record, the assessment of the remaining opinion
> statements in the record remains unchanged.  His most
> recent counseling records show he is doing well with
> stable depression and ADHD symptoms, and that he
> reported that the medications worked perfectly.
> Further, Dr. Turnbull's own treatment notes show that
> the claimant was looking for work, was engaged with
> his church, and was attending to daily activities.  He

engaged in activities that are inconsistent with marked limitations in these areas. For example, the claimant reported to Dr. Turnbull that he was staying busy, [was] able to speak to an audience of 120 without anxiety, speak for up to 30 minutes at a time for groups, attend multi-day conventions, and prepare speeches. These activities are not consistent with being markedly limited in the areas Dr. Turnbull identified. Further, mental status examinations were all generally within normal limits, and do not reflect any findings of abnormalities or limitations [based] upon mental status examination. Overall, his opinion is not consistent with or supported by the evidence of record and [is] given little weight.

Tr. 925-26 (citation to the record omitted).

Plourde claims that the ALJ erred by failing to give good reasons for discounting Dr. Turnbull's opinions concerning his mental RFC. In his motion to reverse, Plourde's argument on this issue consists of nothing more than these 15 words: "the evidence is consistent with Dr. Turnbull's assessment of marked limitations in seven work-related qualities." Cl.'s Mot. to Reverse (doc. no. 8) 8. If that were the full extent of Plourde's claim, I would deem it waived. See Zannino, 895 F.2d at 17.

However, claimant addresses the ALJ's evaluation of Dr. Turnbull's opinions somewhat more expansively in his reply brief. But he does not do so persuasively. For one thing, he focusses on purported deficiencies in the Commissioner's argument for affirmance, but he never actually reaches the dispositive question: whether the ALJ gave good reasons for

discounting Dr. Turnbull's opinions.  For example, he criticizes

the Commissioner's reliance upon his normal mental status

examinations as an impermissible post hoc rationalization

without: (1) acknowledging that the ALJ relied upon that same

reason;[25] or (2) arguing that the ALJ's reference to those

examinations was not a good reason for discounting Dr.

Turnbull's opinions.  The closest that claimant comes to

focusing on the ALJ's decision is his argument that "the

Commissioner cites the same 'activities' the ALJ cited as proof

that [his] mental [limitations were] less severe than his

doctors stated," Cl.'s Reply (doc. no. 16), and that "[t]he

Commissioner offers the same cherry-picking that the ALJ used in

his decision," id.  However, for reasons I explain in the

section that follows, claimant's cherry-picking argument

unavailing.

Given the perfunctory development of claimant's argument

against the ALJ's evaluation of Dr. Turnbull's opinion in his

motion to reverse, and given claimant's focus on the

---

[25] While "it is not for the . . . Commissioner to make
arguments in support of the ALJ's decision that the ALJ did not
make," Gilbert v. Colvin, No. 14-cv-553-LM, 2015 WL 3755118, at
*6 (D.N.H. June 16, 2015) (citing Gurney v. Soc. Sec. Admin.
Comm'r, 880 F. Supp. 2d 174, 178 (D. Me. 2012)), the
Commissioner's argument about normal mental status exams in this
case is not a post hoc rationalization; at two different points
in the paragraph in which the ALJ discounted Dr. Turnbull's
opinions he mentioned mental status examinations Dr. Turnbull
gave Plourde and their normal results.

Commissioner's arguments rather than the ALJ's decision in his reply brief, it is probably fair to say that Plourde has waived his claim that the ALJ erred in his evaluation of Dr. Turnbull's opinions.

But even if Plourde had not waived that claim, I would reject it because the ALJ's decision to give little weight to Dr. Turnbull's opinions is based upon the factors set out in 20 C.F.R. § 416.927(c), and is supported by an analysis that "offer[s] a rationale that could be accepted by a reasonable mind," Levesque, 2019 WL 2004298, at *4. And, finally, even if there is evidence in the record that supports a conclusion different from the one the ALJ drew, as claimant asserts in the 15-word argument in his motion to reverse, that provides no basis for reversing the ALJ's decision. See Tsarelka, 842 F.2d at 535 (explaining that a reviewing court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence"). In sum, as with his evaluation of Dr. Hurst's opinions, the ALJ's evaluation of Dr. Turnbull's opinions gives me no cause to remand this matter.

### c. Cherry-Picking

Next, Plourde claims that when evaluating Dr. Turnbull's opinions, the ALJ impermissibly "cherry-picked" the evidence, focusing on evidence that supported his decision while failing

to account for contradictory evidence.  Specifically, he faults

the ALJ for ignoring the following report he made to Dr.

Turnbull in August of 2013:

> I've had some depression here and there recently, I
> was doing good with that, doing good at church, I went
> to an assembly and just couldn't sit through this the
> whole day, it was a three day event but I had to rest,
> a lot . . . had to do with anxiety, I can't always go
> those big events, that made my tension more and the
> pain worsened.

Cl.'s Mot. to Reverse (doc. no. 8) 9 (quoting Tr. 676) (emphasis

added).

In his cherry-picking claim, Plourde relies upon the

following principles of law:

> An "ALJ's written decision need not directly
> address every piece of evidence in the administrative
> record" if that evidence is cumulative of materials
> that the ALJ does address, or does not support the
> claimant's position.  Lord v. Apfel, 114 F. Supp. 2d
> 3, 13 (D.N.H. 2000).  At the same time, though, "an
> ALJ may not simply ignore relevant evidence,
> especially when that evidence supports a claimant's
> cause."  Id. (collecting cases).  An ALJ therefore may
> not adopt one view of the evidence, "without
> addressing the underlying conflict."  Dube v. Astrue,
> [781 F. Supp. 2d 27, 35 (D.N.H. 2011)].  "Moreover, a
> court must be able to determine whether the ALJ
> considered the contrary evidence and chose to
> discredit it, or whether it was simply ignored."  Id.
> (citation and punctuation omitted).  Thus, "[f]or a
> reviewing court to be satisfied that an ALJ's decision
> was supported by substantial evidence, that decision
> must take into account whatever in the record fairly
> detracts from its weight."  Lord, 114 F. Supp. 2d at
> 14 (quotations omitted).

Brindley v. Colvin, No. 14-cv-548-PB, 2016 WL 355477, at *4

(D.N.H. Jan. 29, 2016).  The problem with Plourde's claim is

that while he charges the ALJ with "fail[ing] to address this

contradictory evidence," Cl.'s Mot. to Reverse (doc. no. 8) 9,

the ALJ specifically cited the evidence to which claimant refers

on page 12 of his decision, and he weighed it against other

reports Plourde gave of his church activities.  Because the ALJ

<u>did</u> address the evidence Plourde says he did not address, and he

weighed that evidence against other evidence, which was well

within his purview, <u>see</u> <u>Purdy</u>, 887 F.3d at 13, Plourde's cherry-

picking claim does not entitle him to a remand.

### d.  Mental RFC Without Expert Opinion Support

Plourde also claims that the ALJ's assessment of his mental

RFC is not supported by substantial evidence because it is not

supported by a medical opinion.

I begin by noting that Plourde does not identify any mental

capacity with which the ALJ erroneously credited him that is

necessary for any job the VE said he could perform.  Thus, he

does not explain how he was harmed by the error he purports to

identify.  <u>See</u> <u>Freddette v. Berryhill</u>, No. 17-cv-672-PB, 2019 WL

121249, at *7 (D.N.H. Jan. 7, 2019) ("[c]ourts routinely find

harmless error 'where an alleged limitation that was not

included in the ALJ's hypothetical (or the RFC) was not

necessary to perform one or more of the jobs identified by the

[vocational expert]'") (quoting <u>Rochek v. Colvin</u>, No. 2:12-cv-

01307, 2013 WL 4648340, at *12 (W.D. Pa. Aug. 23, 2013))

(brackets in Freddette).  And where a Social Security claimant

"fail[s] to demonstrate that any harm flowed from [an] ALJ's

error," the error is harmless, and provides "no basis to remand

. . . for additional proceedings."  Cassidy v. Berryhill, No.

17-cv-451-SM, 2018 WL 1157761, at *6 (D.N.H. Mar. 5, 2018)

(citing Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir.

2000)).  But even if claimant had adequately identified harm, he

has failed to demonstrate an error by the ALJ.

As a general rule, "ALJs [are precluded] from interpreting

raw medical data, or determining a claimant's RFC without expert

opinion support."  Ouellette v. Berryhill, No. 17-cv-409-SM,

2018 WL 3031855, at *5 (D.N.H. June 19, 2018) (citing Durgin v.

Berryhill, No. 16-cv-451-SM, 2017 WL 3432611, at *8 (D.N.H. July

24, 2017)).  Purdy claims that the ALJ in this case determined

his mental RFC without expert opinion support because: (1) the

ALJ gave little weight to the opinions provided by Dr. Hurst,

Dr. Schneider, Dr. Turnbull, and Dr. Jacobson; (2) the ALJ gave

partial weight to the opinions of Dr. Nagy and Ms. Clukay; and

(3) the opinions of Dr. Nagy and Ms. Clukay do not support the

ALJ's RFC assessment.

**Social functioning**.  Plourde's mental RFC includes no

limitations in the realm of social functioning.  While claimant

does not say so directly, I presume he is asserting that the ALJ

erred by giving him a capacity for unlimited social functioning

without any expert opinion support.  Both Dr. Schneider and Dr. Jacobson opined that Plourde had only mild difficulties in maintaining social functioning.  And while the ALJ gave the opinions of Drs. Schneider and Jacobson little weight, he did not discount their appraisals of Plourde's capacity for social functioning.  Therefore, and given the First Circuit's "recogni[tion] that [even] moderate mental limitations impose no significant restriction on the range of work a claimant can perform," Brindley, 2016 WL 355477, at *4 (quoting Hines v. Astrue, No. 11-cv-262-PB, 2012 WL 2752192, at *12 (D.N.H. July 9, 2012)), there is expert opinion support, accepted by the ALJ, for an RFC that has no limitations in the realm of social functioning.

**Concentration, persistence, or pace**.  Plourde's mental RFC includes a limitation to performing jobs that require only the ability to understand, remember, and carry out simple, routine tasks.  Plourde's original claim seems to be that there is no expert opinion support for an RFC that does not include additional limitations in this realm.  But his subsequent concession that "the limitation to simple, routine tasks . . . sufficed to take into account [his] moderate limitation in concentration, persistence or pace," Cl.'s Reply (doc. no. 16) 4, takes this part of Plourde's claim off the table.

### e.  Interpreting Raw Medical Data

Plourde also claims that the ALJ erred by basing his RFC
assessment on his own interpretation of raw medical data.  That
claim fails for the same reasons that Plourde's previous claim
fails.

### 3.  Reliance upon the VE's Testimony

Finally, Plourde claims that the ALJ erred by relying upon
the testimony of the VE because the hypothetical questions the
ALJ posed to the VE included an erroneous RFC.  Plourde rests
his third claim upon a valid legal principle: "When an ALJ's
Step 4 [or Step 5] determination rests upon an erroneous RFC
presented to a VE in a hypothetical question, that determination
is not supported by substantial evidence, which requires a
remand."  Chambers v. Colvin, No. 16-cv-087-LM, 2016 WL 6238514,
at *9 (D.N.H. Oct. 25, 2016) (citing Arocho v. Sec'y of HHS, 670
F.2d 374, 375 (1st Cir. 1982); Marshall v. Colvin, No. 14-cv-
239-PB, 2015 WL 248615, at *4 (D.N.H. Jan. 20, 2015)).  Here,
however, the ALJ committed no reversible error in assessing
Plourde's physical or mental RFC.  Accordingly, his third claim
provides no basis for a remand.  See Chambers, 2016 WL 6238514,
at *9 (citing Reynolds, 2015 WL 2452718, at *8).

### IV. Conclusion

Because the ALJ has committed neither a legal nor a factual
error in evaluating Plourde's claim, see Manso-Pizarro, 76 F.3d

at 16, his motion for an order reversing the Commissioner's decision, document no. 8, is denied, and the Commissioner's motion for an order affirming his decision, document no. 10, is granted. The clerk of the court shall enter judgment in favor of the Commissioner and close the case.

**SO ORDERED.**

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

September 30, 2019

cc:   Alexandra M. Jackson, Esq.
      Karen B. Fitzmaurice, Esq.
      Jessica Tucker, Esq.